GOTTSCHALK BROS., INC., Appellant, v. CITY OF WAUSAU, Respondent.

*No. 266. Argued November 27, 1972.—Decided January 15, 1973.*
(Also reported in 203 N. W. 2d 140.)

850

For the appellant there were briefs by *Genrich, Terwilliger, Wakeen, Piehler & Conway*, attorneys, and *Douglas J. Klingberg* of counsel, all of Wausau, and oral argument by *Mr. Klingberg*.

For the respondent there was a brief and oral argument by *James A. Simmonds*, city attorney.

ROBERT W. HANSEN, J. This case resembles a jigsaw picture puzzle, or, more accurately, the pieces of three jigsaw puzzles jumbled together. Until it is determined how the work done that is involved in this dispute fits into the picture, the pieces cannot be put together. It is not possible to locate the law or apply the appropriate legal conclusions unless or until the nature of the work done is determined. Once that is decided—what the work done constituted in relation to the contract—the picture puzzle is easily completed.

We see three, not two, possible answers to describing, legally, how the work done and not paid for relates to the contract involved.

(1) *Extra work.* If item number 13 (the only section of the contract here involved) was a contract for providing 16,000 cubic yards of fill-borrow materials, with an added provision for extra work to be done at the same unit price, then the work necessitated by the grade problems in the rock cut area was extra work. If it is such a contract containing such provision for such extra work, sec. 62.15 (1c), Stats., permits the increase in the quanti-

ty of work that was done under the contract, but only to the extent of 15 percent of the cost of the original contract. (*See: Blum v. Hillsboro* (1971), 49 Wis. 2d 667, 183 N. W. 2d 47.)

(2) *New contract.* Another view of the situation would see two contracts here involved. Under the written agreement between the parties (awarded in compliance with sec. 62.15, Stats.) the parties proceeded to operate until they encountered the rock cut. At that point, under the contract, the city had the right to stop the filling, excavate or contract with someone else to excavate. The city stopped the work, but then, under its option, directed a fill operation, one not contemplated or provided for in the written contract. So viewed, a second contract should have been let in compliance with sec. 62.15. Under this view, the parties proceeded under a *malum prohibitum* oral agreement, entered into in complete good faith but not in compliance with the applicable statutory requirements. The sole recourse of the plaintiff then would be to seek to recover, not on the unit price basis set forth in the contract, but on the basis of unjust enrichment, for ". . . an amount which represents the actual cost to the plaintiff, without allowing profits including overhead expense, and . . . in no event [to] exceed the unit cost of the original contract. . . ." (*See: Blum v. Hillsboro, supra,* at page 674.)

(3) *Contract work.* The third possible categorization of the work performed under item number 13 is that it was not extra work, and not work performed outside the contract, but work contemplated and provided for in the contract. This would hold item number 13 to be not a contract to provide fill-borrow materials up to a contract specified figure of 16,000 cubic yards, but as a "unit priced" provision, providing that the contractor was to be paid a specified amount for every unit of needed and designated work that he performs. (*See: Justin Sweet, Legal Aspects of Architecture, Engineering,*

*and the Construction Process* (1970), page 316, for a discussion of the "unit pricing" type of construction contract. *See also: Probst v. Menasha* (1944), 245 Wis. 90, 94, 13 N. W. 2d 504, stating, "There is no limitation upon the amount of sidewalk that the contractor might be required to do, his bid being on a unit basis.")

Narrowing consideration and conclusion to this one provision (item number 13) of this particular contract under these special circumstances, we find three facts or factors in this record that compel the conclusion that this was not "extra work," nor work for which a new contract was required, but rather was work provided for and performed pursuant to the written contract between the parties on a "unit price" basis. These three facts or factors are:

(1) *Approximation of quantity.* Item number 13 states the quantity of fill-borrow materials to be furnished only as an approximation. That the qualifying word, "approximately," reflected an understanding that the quantity was expected to be varied by conditions encountered is clear from the surrounding circumstances. Some variation from original plans is expected in almost all major construction projects. But here more than a usual leeway is involved. To save some thirty or so days, the city made no survey of conditions existing. Nor did it have a survey made. Instead it accepted information from the insurance company owner of a nearby building. The use of the company's layout or sketches, prepared for the owner of an adjacent building for the use of such owner, strengthens the conclusion that the stated approximation of quantity was not intended to be exact, or even close to that target.

(2) *Existence of option.* That the contract attaches only slight weight to the approximation as to quantity is made clear by the inclusion in item number 13 of an option given to the city to stop filling and substitute excavating at its own expense, in place of continued filling by the plaintiff, to establish the required grade level.

If no more than usual slight variances were anticipated, it seems unlikely that the city would put into the contract a right for it to stop all filling at any stage and substitute excavating, either doing the excavating itself or contracting with someone else for its being done. It developed that the city engineer, who under the contract had "general supervision and direction of all work," and was to "decide all questions which may arise relative to the . . . execution of the plans," determined that excavation would be more costly to the city than having the plaintiff do the filling beyond the 16,000 cubic yard expectation. The city engineer had the authority to stop the work, decide the question and determine that the plaintiff was to proceed with the filling. When he did just that, he acted pursuant to the contract, and his right so to do and the existence of the option he exercised indicates that, as to item number 13, it was the unit price, not the estimation of "approximate" quantity, which was the primary consideration.

(3) *Stipulation of the parties.* In this case the city and the plaintiff stipulated that no written change order was required from the board of public works or board of education for the work performed under item number 13. The contract provided such prior written authorization before performing any "extra work." In fact, the contract provided that plaintiff was not to be paid for any unauthorized "extra work." Not only the stipulation, but the agreement, the understanding of the parties and their acts strongly indicate neither "extra work" nor unauthorized work was here involved. It was work performed under item number 13, for which no additional authorization or "change order" was required by the contract.

Putting together the approximation only as to quantity in item number 13, the existence of the option to excavate rather than fill if extreme undulations in grade were encountered, and the stipulation that no change order or special authorization was required for the work per-

formed, we conclude that the work done, stipulated to be reasonable, and necessary under the contract, was performed by plaintiff under a contract that provided it was to be paid on a "unit price" basis under item number 13 for every unit of required fill-borrow material that it supplied. All three facts or factors were given weight in reaching this result, so we have here no more than an evaluation of a particular record, not likely to be again repeated. Given this contract, these circumstances, and this stipulation, we conclude that the judgment of the trial court must be set aside, and the case remanded with instructions to enter judgment in favor of the plaintiff in the amount of $17,122.74, together with interest at the legal rate from September 20, 1967, the amount stipulated by the parties to be due the plaintiff if sec. 62.15 (1c), Stats., is held not to be applicable.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment for the plaintiff not inconsistent with this opinion.

HEFFERNAN, J. *(dissenting)*. The majority opinion seeks to solve a problem of the overrun of a municipal contract in a fair and equitable manner. The solution makes sense, and would be eminently lawful and reasonable if the contracting parties were both private entrepreneurs. They are not. A city can deal only in accordance with the general city charter law, and one who deals with a city does so at his peril. He is limited to the recovery of such sums as a city may by state statutes lawfully disburse.

I believe that sec. 62.15 (1c), Stats., applies to the Gottschalks' claim, and its recovery is limited to an amount not in excess of 15 percent of the sum contracted for.

A city is a body corporate organized under, and subject to, terms dictated by the state legislature. It has autonomy only in the areas authorized by the home rule amendment. The method of municipal contracting is

not, under the facts of this case, within the ambit of home rule and is fully controlled by general charter statute.

Charles Rhyne has stated the general principles:

"**Source and Nature of Contract Powers.** Municipal corporations do not possess unlimited power to contract. And hence persons contract with the municipality at their peril and must determine beforehand whether or not the corporation has the power to enter into the particular contract in question. In general, a municipal corporation is the creature of the state and as such its powers are derived from the state." Rhyne, *Municipal Law,* p. 254, sec. 10–1.

Bearing these principles in mind, it is apparent that the statutory requirements of sec. 62.15 (1c), Stats., are incorporated in every municipal contract. They must be placed there expressly by the parties or they will be read into the contract by operation of law.

Sec. 62.15 (1c), Stats., provides:

"INCREASED QUANTITY CLAUSES. Contracts may include clauses providing for increasing the quantity of construction required in the original contract by an amount not to exceed 15 per cent of the original contract price."

While this is not a mandatory provision in a municipal contract within the requirements of sec. 62.15, Stats., it is a grant of power to the municipality which, unless exercised, curtails the right of a municipality (except in unusual cases giving rise to equitable remedies) to pay any excess over the contract price. If any excess is to be paid, the provision must appear in the contract.

Hence, if we are to find, as does the majority, that sec. 62.15 (1c), Stats., does not apply, logic leads to the conclusion that no payments whatsoever may be made for the excess fill.

The contract itself, however, incorporates the essence of sec. 62.15 (1c), Stats. Paragraph XVIII, relating to unit bid quantities, states:

"A. The amount of each bid unit may be subject to increase or decrease but the total bid sum will determine the total amount of work plus or minus 15% of the total bid."

Accordingly, sec. 62.15 (1c), Stats., is in substance incorporated in the contract itself.

It appears that, even if the individual unit costs to the owner are permitted to be increased, the total is limited to plus or minus 15 percent of the total bid. This being the case, it is difficult to find a rationale that would justify payment for an unlimited number of units.

The majority view apparently is that a contract bid on a unit basis is open-ended, *i.e.*, that the city, as the owner, could, as long as the scope of the work remained the same, insist on an infinite number of units; and the contractor could use an infinite number of units irrespective of total cost to the city.

There is some support for this view. *Probst v. Menasha* (1944), 245 Wis. 90, 94, 13 N. W. 2d 504, states, "There is no limitation upon the amount of sidewalk that the contractor might be required to do, his bid being on a unit basis."

While this holding appears to ratify unit priced contracts, and I believe properly so, *Probst* does not hold that the contractor could have installed an infinite number of sidewalk units in the city and charged for them without limitation.

*Thomsen-Abbott Construction Co. v. Wausau* (1960), 9 Wis. 2d 225, 100 N. W. 2d 921, implicitly recognizes the validity of unit price contracts, but *Thomsen-Abbott*, like *Probst*, was based on contractual relationship that arose before the enactment of sec. 62.15 (1c), Stats.

While the matter is not wholly free from doubt, I see sec. 62.15 (1c), Stats., as a limitation of the implicit holdings of *Thomsen-Abbott* and *Probst*. The effect, therefore, of sec. 62.15 (1c) is that the units contracted for—"the quantity of construction"—may not be in-

creased so as to result in more than 15 percent increase in the contract price.

Only this interpretation is fully consonant with the purpose of the bid statute.

"The bid statute is intended to secure competition and to attain the best work or materials or supplies at the lowest practical price. It is also intended to prevent favoritism, extravagance, fraud and corruption. The statute is enacted for the protection of taxpayers and not for the benefit of bidders. The statute should be construed with reference to the public interest. See McQuillin, Mun. Corp., 3rd Ed., Vol. 10, pp. 266 and 267, Sec. 29.29 and *Victora v. Muscoda,* 228 Wis. 455, 279 N. W. 663." League of Wisconsin Municipalities, *The Letting of Contracts* (1953), p. 23, sec. IV.

The city council and the city attorney and the trial judge properly concluded that the contractor could recover no more than 15 percent in excess of the bid price. To approve a payment that is 300 percent in excess of the amount bid would encourage the very abuses sec. 62.15 (1c), Stats., is designed to avoid. The use of unit price contracts in a manner interpreted by the majority would make reasonable municipal contract budgeting impossible. It would free the common council of fiscal responsibility to the taxpayer. If unit pricing is to be the "open sesame" to unlimited contractual obligations by municipalities, the legislature should clearly say so. I would affirm the trial court.

I am authorized to state that Mr. Justice WILKIE joins in this dissent.